# IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JOE LANKTREE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 10-04124-CV-C-NKL |
| | ) |
| I-70 TOWING, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Plaintiffs Joe Lanktree, et al., claim that their employer, I-70 Towing, LLC, and its owner, John Berghager (together, "I-70 Towing"), failed to pay Plaintiffs minimum wage for the hours they worked on multiple work weeks, in violation of the Fair Labor Standards Act of 1938 ("FLSA"). Pending before the Court are Lanktree's motion for partial summary judgment [Doc. # 51] and I-70 Towing's motion for summary judgment [Doc. # 55]. For the following reasons, Lanktree's motion is GRANTED in part and I-70 Towing's motion is GRANTED in part.

**I.  Factual Background**[1]

Joe Lanktree, Frank Washburn, Justin Rose, and Terry Reams were all employed at I-70 Towing, LLC, as tow-truck drivers and are the Plaintiffs in this collective action against I-70

---

[1] The Court denies I-70 Towing's request to dismiss Lanktree's claim for failure to comply with local rule 56.1(a) by including multiple facts in single numbered paragraphs. Lanktree's statement of facts was reasonably organized and coherent and presented no prejudice to I-70 Towing.

1

Towing under the FLSA. Reams drove a large tow truck while the other Plaintiffs drove small tow trucks, and their duties differed on that basis. Defendant John Berghager is a principal of I-70 Towing. The Plaintiffs seek recovery of unpaid minimum wage over a three-year period.

Lanktree, Rose, and Washburn, while employed at I-70 Towing, were scheduled to be "on-duty" at I-70 Towing's office from 8:00 a.m. to 5:00 p.m. on weekdays. After that time, they were on "first call," but with primary responsibility for all incoming calls, from 5:00 p.m. to 8:00 a.m. two nights a week and for every hour of one to two weekends a month. While on "first call," they were not required to be in the office. Likewise, they were on "second call," but with secondary responsibility for taking incoming calls, from 5:00 p.m. to 8:00 a.m. two nights a week and for every hour of one to two weekends a month. "On second call," they also operated outside the office. In a normal week there was one evening in which these Plaintiffs were not on call and in a normal month there was one weekend where these Plaintiffs were not on call. Reams was either working on duty or on call for every hour of every week, although he did take some weekends off during his employment. Plaintiffs had the ability to schedule their hours around vacations, but any changes to the schedule were subject to approval by I-70 Towing's management.

While on first call, Plaintiffs generally received two to three calls a week night with five calls being the maximum and zero calls being a rarity. Plaintiffs also generally received ten to twelve calls over a weekend. While on second call, employees generally received zero to one calls on a week night, and around two calls over a weekend. Reams averaged two calls per every period of twenty-four hours.

I-70 Towing kept a log of hours worked, which its employees filled out primarily to prepare for audits by the Department of Transportation. Berghager testified that this log book

2

was inaccurate in that it did not track time worked outside the employee's scheduled on-duty hours. Berghager also noted that the log books recorded days worked by employees who were not in the office and responded to no calls. The parties dispute whether Berghager instructed his employees to under-report their hours. The parties agree that Plaintiffs, except for Reams, generally worked forty-five hours of on-duty time a week, but appear to dispute whether these Plaintiffs worked any on-duty hours beyond that.

Every time a tow-truck driver responded to a call, he provided I-70 Towing with a ticket detailing the response. I-70 Towing assembled these into "Driver Commission Reports" that it submitted to a third party to determine its drivers' pay. Berghager testified that Plaintiffs' time spent actually responding to calls while on call could be approximately calculated by multiplying the number of calls by one hour. The parties agree that responding to a call took an average of one hour and fifteen minutes. [Doc. # 56 at 9].

I-70 Towing did not produce records sufficient to determine Rose's hourly rates. But the parties agree that the same general conditions of employment that applied to Lanktree and Washburn also applied to Rose. [Doc. # 60 at 13].

While employed at I-70 Towing, Lanktree complained to both Berghager and Lanktree's supervisor, Bart Maxwell, that the compensation policy violated minimum wage laws. Berghager did not know the federal minimum wage rate at the time Plaintiffs were employed at I-70 Towing and he never attempted to calculate whether his employees were earning minimum wage.

Berghager informed Plaintiffs that failure to answer their phones while on call would result in a $25 decrease in pay, although Berghager never actually docked an employee's pay on

these grounds.  The parties dispute to what degree Plaintiffs were allowed to refuse to respond to a call or trade that call with another employee.

After answering a call, Plaintiffs were expected to drop what they were doing and begin heading to the site within five minutes.  Plaintiffs were expected to arrive at a tow site within a "reasonable amount of time," but the parties dispute how quickly I-70 Towing expected Plaintiffs to arrive at a tow site after receiving a call.  It is undisputed that I-70 Towing told Plaintiffs that it may refuse to pay them for calls responded to while not wearing their work uniform.  Although I-70 Towing never refused to pay an employee on this basis, Berghager would talk to any employee who responded to calls out of uniform.  Berghager expected Plaintiffs not to consume alcohol on call, but never advised them against it.  Plaintiffs were expected to be well-groomed and presentable when responding to a call.

## II.     Discussion

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

### A.     Time spent on duty

An employer violates the FLSA's minimum wage requirements in any work week in which the weekly wage paid to an employee is less than the number of hours that the employee worked in that week multiplied by the federal minimum hourly wage.  *See Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986).  The minimum hourly wage is currently $7.25 per hour and has been since July 24, 2009, before which it was $6.55 per hour.  29 U.S.C. § 206(a) (2007).

Every employer subject to the FLSA is required to create and maintain records of the wages and hours of its employees. 29 U.S.C. § 211©. Where an employer fails to keep such records, "courts should not hesitate to award damages based on the just and reasonable inference from evidence presented." *Martin v. Tony and Susan Alamo Found.*, 952 F.2d 1050, 1052 (8th Cir. 1992), *cert. denied*, 505 U.S. 1204 (1992).

Lanktree argues that I-70 Towing's own work logs demonstrate that I-70 Towing failed to pay Lanktree minimum wage on multiple workweeks for time spent on duty. I-70 Towing, relying on the contrary deposition testimony of Berghager, disputes several of the entries in its own logs. Specifically, Berghager testified that the logs were incorrect and that the Plaintiffs only worked 45 on-duty hours a week. Relying on Berghager's testimony, I-70 Towing also points out 43 days on which various Plaintiffs recorded a nine-hour day, but on which their commission report showed that they did no towing. Berghager suggested those were days on which the Plaintiffs were not on duty and should not have recorded any work on the work log.

Lanktree argues that the Court should resolve those disputes in favor of the logs, since it was I-70 Towing's obligation under FLSA to keep accurate records of the workweek. Lanktree has pointed to no authority that would allow the Court to disregard the summary judgment standard to resolve disputed evidence in favor of the non-movant. It may be a good policy to deny an employer the right to contest its own records, but the Court is not responsible for making policy. This is not a case like *Camfield Tires Inc. v. Michelin Tires Co.*, 719 F.2d 1361 (8th Cir. 1983) where a deponent attempted to create a
5

disputed issue of fact by filing an affidavit contradicting his own prior testimony; nor is it analogous. A party has always had a right to contest the accuracy of its own documents prepared before litigation, although it is a steep hill to climb.

Thus, in considering Lanktree's motion for partial summary judgment, the Court only considers the on-duty hours that are undisputed, drawing all reasonable inferences in favor of I-70 towing, the nonmovant. The Court accepts Lanktree's calculations, based on a work week consisting of the lesser of 45 hours or the amount reported in the logs, and subtracting the 43 days in which I-70 towing claims Plaintiffs were not on duty. [Doc. # 61 at 6, 7]. The Court also accepts Lanktree's calculations based on weeks in which Lanktree was paid and no work appeared on the work logs, where Lanktree substituted 45 hours of on-duty work, according to I-70 Towing's admissions. [Doc. # 61 at 7]. Consequently, the Court grants summary judgment for Lanktree on I-70's liability for those 24 weeks, as I-70 Towing has presented no evidence on which a reasonable juror could find Plaintiffs were properly compensated for on-duty time during those weeks. Because Lanktree has not requested summary judgment on the amount of unpaid wages during those weeks, this judgment only covers liability during that time period. As to the remaining weeks in the three-year period in this claim, there is a genuine dispute about the number of hours each Plaintiff worked in each.

### B. Time Spent Responding to Calls

Lanktree argues that in addition to hours worked on duty, Plaintiffs responded to several calls while off duty but on call, and that these should be factored into Lanktree's

calculations for liability and damages. Lanktree claims that while I-70 Towing admittedly failed to keep track of these hours, the Court can reliably calculate those hours from uncontroverted facts. Specifically, Berghager testified that each call lasts about one hour, and this testimony plus the number of work tickets submitted by Plaintiffs can be used to determine how many hours they spent responding to calls when off duty.

I-70 Towing raises several arguments to challenge Lanktree's calculations. I-70 Towing's main argument is that Lanktree's only evidence of the number of such hours worked is the expert testimony of Alan Fine, which I-70 Towing claims is inadmissible because Fine relied on incomplete data in making his calculations. Specifically, Mr. Fine did not have access to at least 5 weeks of data for all Plaintiffs, lacked 24 weeks of data for Washburn and all data for Rose. I-70 Towing contests Mr. Fine's decisions to (1) assume Lanktree responded to as many calls as Rose; (2) extrapolate from Washburn's available data for the missing 24 weeks; and (3) assumed that all drivers spent an average of 1.25 hours on each call.

These gaps in data are all the result of I-70 Towing's inadequate record-keeping. However, while Lanktree may support his claim with just inferences rather than exact data, he must first convince the fact finder that his inferences are reasonable. The Court cannot say as a matter of law that Fine's testimony is credible and must be accepted as true. However, it is clearly admissible and if the fact finder concludes it is credible, the burden of proof at trial will shift to I-70 Towing to prove the actual hours worked by Plaintiffs. This is because the Defendant cannot be rewarded for failing to maintain

7

accurate records as required by the FLSA. Because Dr. Fine's testimony is disputed, however, Lanktree's Motion for Summary Judgment is denied.[1] I-70's Motion for Summary Judgment on this issue is also denied.

I-70 Towing also argues, without saying so explicitly, that because Plaintiffs were aware of its compensation scheme, they waived their right to a minimum wage by accepting and maintaining employment there. I-70 Towing cites a single, out-of-circuit case for this proposition. The Court does not explore this argument further because it is clear that, at least in the Eighth Circuit, an individual cannot waive their right to FLSA benefits. *See, e.g., Copeland v. ABB, Inc.*, 521 F.3d 1010, 1014 (8th Cir. 2008).

### C.     Time Spent on Call

Lanktree also argues that the time Plaintiffs spent "on call," constituted "work" under FLSA and that I-70 Towing under-compensated Plaintiffs for this time. The FLSA does not define work, but the Supreme Court has defined it as time spent "predominately for the benefit of the employer." *Armour & Co. v. Wantock*, 323 U.S. 126, 165 (1944). In making this determination, courts should take a "practical approach based on the realities of each case." *Id*. "Time spent away from an employer's premises may constitute compensable hours of work if conditions imposed by an employer restrict the employee from using the time for personal pursuits." *Cross v. Arkansas Forestry Comm'n*, 938 F.2d 912, 916 (8th Cir. 1991).

---

[1] While it appears that some of the work tickets are undisputed, Lanktree has not separated those undisputed work tickets from the work tickets I-70 has disputed. Therefore, the Court is unable, on this record, to make a calculation based on the undisputed work tickets.

8

Each party relies heavily for its argument on one of two opposing cases in the Eight Circuit. Lanktree relies on *Cross*, which reversed a district court's entry of summary judgment for the employer on an FLSA overtime claim for on-call hours. *Cross v. Arkansas Forestry Comm'n*, 938 F.2d 912, 916 (8th Cir. 1991). The Eight Circuit discussed several restrictions placed on forestry employees during on-call time, including that they were: (1) limited in travel to 35 to 50 miles; (2) required to respond to calls within thirty minutes and depart immediately thereafter; (3) required to be physically and mentally capable of fighting a fire if called; (4) kept from participating in activities with loud noise, which might render the employees unable to monitor the emergency radio; and (5) made unlikely to participate in costly activities because of the possibility that the employee would have to abandon the activity, wasting their money. *Id.* at 916-17. The Eighth Circuit noted that employees were disciplined if they failed to timely respond to call unless they had an "acceptable explanation." *Id.* at 914.

The Eighth Circuit also noted that the facts of that case were "unlike typical on-call cases" in that employees were required to actively monitor radio transmissions rather than simply await calls and because employees were on subject-to-call status "twenty-four hours per day every day of a work period, unless a supervisor agrees to substitute for a particular employee for a period of time." *Id.* at 917. The Eighth Circuit did not address the frequency with which employees were actually called in.

I-70 Towing relies on *Reimer*, which affirmed the district court's entry of summary judgment to the employer hospital on a claim by employee nurses that they were entitled

9

to be paid minimum wage for time spent on call. *Reimer v. Champion Healthcare Corp.* 258 F.3d 720, 724 (8th Cir. 2001). The Eight Circuit discussed several restrictions placed on employees during subject-to-call time, including that they were: (1) only allowed to travel twenty minutes away from the hospital; (2) required to report to the hospital within twenty minutes of a call; and (3) prohibited from using alcohol or mind-altering drugs. *Id.* While the nurses had to be reachable by cellular phone, beeper, or a forwarded number at all times, the Eighth Circuit found the nurses were otherwise free to do whatever they wished. *Id.* The Eight Circuit found that it was uncommon for the nurses to be called in more than once during a scheduled on-call period and that this "mitigated against a conclusion that the on-call time was spent predominately for the benefit of [the employer]." *Id.* at 725. Although the *Reimer* court did not mention this, the district court found that employees in that case were allowed to trade calls. *Wisnewski v. Champion Healthcare Corp.*, 2000 WL 1474414, at *5 (D.N.D. 2000). The *Reimer* court did not discuss how many hours the nurses in that case spent on call in a week. The *Reimer* court "stress[ed] the limited nature of [its] holding," recognizing technology's capacity to "reshape our concept of the workplace." *Reimer v. Champion Healthcare Corp.* 258 F.3d 720, 726 (8th Cir. 2001)

Lanktree's claim does not fall easily within the reasoning of either case. The parties do not dispute that I-70 Towing expected Plaintiffs to: (1) remain within or fairly close to Columbia, Missouri; so that they could (2) begin to respond to a call within five minutes and arrive on site within a reasonable amount of time; (3) abstain from drinking

10

alcohol and be physically and mentally ready to operate a tow truck, which included arriving in uniform and appearing well-groomed. In these regards, Lanktree's claim is substantially similar to both *Cross* and *Reimer*.

Unlike in *Cross*, I-70 Towing required Plaintiffs to be accessible by cellular phone rather than requiring them to monitor a radio. But here, similar to *Cross,* Plaintiffs' on-call hours resulted in twenty-four hour workdays on four of every five weekdays, and Plaintiffs worked every hour of three out of every four weekends in a month, approaching "twenty-four hours per day every day of a work period." *See Cross v. Arkansas Forestry Comm'n*, 938 F.2d 912, 917 (8th Cir. 1991). Also, the parties agree that Reams was generally on call every hour of every week, although he took some weekends off.

Although the parties dispute the frequency of calls received while Plaintiffs were on call, the parties agree that the frequency for first-call shifts was greater than in *Reimer*. Specifically, the parties agree that when Plaintiffs were on "first call" (half of all shifts) they could expect around 2 to 3 calls on week nights and 3 to 4 calls on weekend nights, each call lasting at least an hour. The parties also agree that when Plaintiffs were on "second call" (the other half of shifts) they could expect one call a night and one to two calls over a weekend. Some of these calls were during normal sleep hours.

The parties also dispute whether Plaintiffs were allowed to trade or reject calls when on call. I-70 Towing relies on Berghager's testimony in arguing that drivers on call were free to decline to take a call or trade calls. [Doc. # 56-1 at 3]. Lanktree argues that Plaintiffs were required to take all calls, relying on statements by Lanktree and Rose that

11

Berghager threatened to fire anyone who turned down calls [Doc # 58-4 at 16-17; Doc. # 59-2 at 22] and Rose's statement that Berghager told Rose that Rose was fired for declining calls. [Doc. # 59-2 at 2].

The Court finds that the degree to which drivers can decline or trade calls is a genuine issue of material fact that precludes summary judgment for either party as to first-call hours. If, as I-70 Towing claims, drivers can decline or trade calls with "no restrictions," then I-70 Towing would be entitled to judgment as a matter of law on this issue. Plaintiffs could engage in whatever activities they wanted during on-call time, confident that if a call came at an inconvenient time, they could decline or trade at will the call. Thus, the restriction on the Plaintiffs' personal activities would be far less than in *Reimer*. On the other hand, if, as Lanktree claims, declining a call was grounds for termination, then I-70 Towing would not be entitled to summary judgment because Plaintiffs: (1) knew they could expect to spend 2 to 3 hours in an evening responding to calls; (2) did not have prior knowledge when in the evening those hours will fall; and (3) knew that they must be willing to drop within 5 minutes any activity they began to respond to a call or else risk losing their full-time job. They would also need to physically presentable and in uniform, substantially limiting their activities during first call hours. This is also true for all of Reams's shifts, in which he could expect 2 calls in each twenty-four-hour period, more than in *Reimer*, and rarely had a single hour off-call, as in *Cross*.

As did the Eight Circuit in *Reimer*, the Court looks to the most factually similar case in another circuit and observes a consistent result. *See Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1535 (10th Cir. 1991) (affirming summary judgment for employee firefighters for on-call hours, relying "primarily" on the frequency of three to five calls, each lasting about an hour, over twenty-four-hour shifts). However, until there is resolution of whether the Plaintiffs were free to decline any and all calls outside of normal office hours, the Court cannot say whether Plaintiffs are entitled to judgment as a matter of law.

As for second-call hours, the parties do not dispute that the frequency of calls is the same or less than in *Reimer*, so that case controls and mandates summary judgment in favor of I-70 Towing as to those hours. This is true regardless of whether Plaintiffs were free to reject or trade calls.

### D. Willfulness

I-70 Towing also moves for summary judgment on the issue of whether it willfully violated the FLSA. To show that an employer's violation of the FLSA was willful, a plaintiff must prove that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

I-70 Towing first argues that it did not willfully violate the statute because its policy reflected business customs in the area, and are unchanged from the policies of previous ownership. This argument fails because the FLSA "was not designed to codify

13

industry customs and contracts." *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 741 (1981) (internal quotes omitted).

I-70 Towing also argues that there is simply no evidence that it knowingly or recklessly disregarded the FLSA. But Lanktree produces several pieces of evidence that, at least in aggregate, could lead a reasonable juror to conclude that I-70 Towing's violation was willful. Specifically, Lanktree produced evidence that: (1) Lanktree complained both to Berghager and to Maxwell about the legality of the compensation scheme; (2) I-70 Towing committed several record-keeping violations under FLSA; (3) Berghager knew his work logs under-reported hours actually worked; (4) Berghager ordered Plaintiffs to falsify their work logs to reflect fewer hours worked and threatened to fire Rose if he did not comply; (5) Berghager was unaware of the relevant federal minimum wage amount; and (6) Berghager never attempted to calculate whether Plaintiffs were being paid minimum wage for their hours worked. I-70 Towing has not shown that the undisputed facts entitle it to summary judgment on the issue of willfulness.

**E.     Costs**

Although Lanktree did not request summary judgment on the amount of unpaid wages under FLSA, Lanktree did request summary judgment on the issues of liquidated damages, pre-judgment and post-judgment interest, attorney's fees, and court costs. However, Lanktree presented no argument on these issues in Plaintiffs' Suggestions in Support of their Motion for Summary Judgment. Thus, the Court denies summary

14

judgment on those claims without prejudice until resolution of the remaining liability issues and the amount of damages.

## III. Conclusion

Accordingly, it is hereby ORDERED that Lanktree's motion for partial summary judgment [Doc. # 51] is GRANTED in part and I-70 Towing's motion for summary judgment [Doc. # 55] is GRANTED in part. The case will proceed to trial on the genuine issues of material fact identified in this Order.

        s/ NANETTE K. LAUGHREY
        NANETTE K. LAUGHREY
        United States District Judge

Dated: October 6, 2011
Jefferson City, Missouri